RECEIVED
AK
5/8/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

VIVEK SHAH,
      Plaintiff,

v.

CITIBANK, N.A.,
      Defendant.

Civil Action No ._____

**1:22-cv-02437**
**Judge John Robert Blakey**
**Magistrate Judge Sunil R. Harjani**
**RANDOM**

<u>**VERIFIED COMPLAINT**</u>

**FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES**

*JURY DEMANDED*

<u>**NATURE OF THE ACTION**</u>

1.      Citibank, N.A. ("Citibank" or "Citi") categorically rejects felons from opening

and maintaining any of its checking or credit accounts. It maintains and enforces policies of

automatically excluding any person with a record of a felony conviction from accessing its

checking and credit products. It terminated Plaintiff's checking account and credit card without

providing the specific reasons required by law and then denied him a $1500 checking bonus

offer due to its own unlawful account closure. Plaintiff, proceeding *pro se*, brings this suit

against Citibank under the civil remedies provided in the Equal Credit Opportunity Act

("ECOA"), 15 U.S.C. § 1691 et seq., Regulation B promulgated thereunder, 12 C.F.R. § 1002,

and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") to (1) prevent

Citibank from continuing its unfair and unlawful conduct against Plaintiff, (2) to ensure that

Plaintiff will have a meaningful opportunity to have access to essential banking services, and (3)

to redress the harm Plaintiff has suffered as a direct result of Citibank's conduct.

2.      There are readily available alternatives to an automatic blanket ban on felonies for dealing with any potential concerns about applicants with a criminal record. Instead of automatically excluding every applicant within the scope of its policies, Citibank can and is legally required to individually assess potential applicants with a felony by considering factors directly relevant to the prospective applicant's credit history. Individualized assessments would permit Citibank to carefully review the credit history of applicants that would also permit prospective applicants who have a criminal record, but who pose no threat to the bank to obtain credit.

3.      Citibank's policies and practices directly prevent individuals like Plaintiff who are reentering society after time in prison from securing any tangible thing of value, whether it is housing, medical supplies, or clothing, that is crucial to their successful reintegration. Citibank's policies and practices also impacts individuals with a prior conviction long after an individual has successfully reentered the community.

4.      An applicant who has a criminal history within the scope of Citibank's policies is automatically barred regardless of the nature of the conviction, the amount of time that has lapsed since the conviction, evidence of rehabilitation, prior credit or banking history, or any other factor related to whether the person poses a threat to Citibank's business. As a result, an elderly person with a decades-old drug conviction is treated identically to a person with a very recent violent conviction: both are barred without further review.

5.      As a direct result, applicants with a felony are (1) deterred from ever applying to Citibank's credit products since it would lower their credit score with the credit bureaus; and (2) denied essential banking services because of the anti-felon policies.

6.      Instead of automatically excluding every applicant covered by its far-reaching policies and practices, Citibank should individually assess an applicant with a criminal history by considering factors directly relevant to the applicant's qualifications for credit such as the nature of the conviction or conduct, when it occurred, their age at the time the conduct occurred, their post-conviction and post-release conduct, evidence of their rehabilitation, evidence of whether their credit approval would create a direct threat to Citibank's business, their credit history, and other relevant factors. When considered in their totality, such an individualized assessment enables a creditor to make a reasoned decision about a particular applicant's suitability for credit approval.

7.      The more tailored approach required by an individual assessment protects financial and business interests of Citibank, yet it is less exclusionary because it reduces the number of felons who are categorically barred from being extended credit.

8.      Plaintiff brings this action to address Citibank' unlawful conduct and to redress the harm he has suffered and will continue to suffer as a direct result of that conduct, absent relief.

9.      Plaintiff seeks injunctive, monetary, and declaratory relief against Citibank for engaging in this unfair and unlawful practice.

## PARTIES

10.      Plaintiff Vivek Shah is a natural-born U.S. citizen. In August 2012 he was arrested by the FBI for Mailing Threatening Communications with the intent to extort. He was sentenced in the Southern District of West Virginia to 87 months in prison. The arrest and conviction were widely reported by the media, in part due to Plaintiff being an actor that appeared in various movies, television shows and commercials, and him being in pictures with

3

many celebrities. On February 4, 2019, he was released from prison, and on February 4, 2020 his supervision was terminated by Honorable Jorge L. Alonso of this Court. His principal place of residence is 236 Woburn Ln, Schaumburg, IL 60173.

11.     Citibank is a federally chartered bank with its principal place of business at 388 Greenwich St, New York, NY 10013. The bank has 2,649 branches in 19 countries, including 723 branches in the United States. It is the consumer division of financial services multinational Citigroup, serves more than 200 million customer accounts and does business in more than 160 countries and jurisdictions.

12.     In acting or omitting to act as alleged herein, Citibank was acting through its employees and/or agents and is liable on the basis of the acts and omissions of its employees and/or agents.

13.     In acting or omitting to act as alleged herein, each employee, officer or agent of Citibank was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by Citibank as principal.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter under 15 U.S.C. § 1691e and 28 U.S.C. § 1331.

15.     This Court has supplemental jurisdiction over the state law claim in this action under 28 U.S.C. § 1367(a) because it is also related to the federal claims asserted against Citibank so that it forms part of the same case or controversy under Article III of the U.S. Constitution.

16.     This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 & 2202, 815 ILCS 505/10a(c), and Rule 57 of the Fed. Rules of Civ. P.

17.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Citibank is a national bank that is chartered and supervised by the Office of the Comptroller of the Currency, an agency in the U.S. Treasury Department, pursuant to the National Bank Act. Citibank has bank branches throughout the Northern District of Illinois where Plaintiff has transacted with Citibank. Plaintiff is a resident of Schaumburg, IL. A substantial part of the events and omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

### I.     Citibank's Conduct Leading to the Instant Suit

18.     On or around January 22, 2021, Plaintiff applied for and was approved by Citibank for a Citi Rewards+(SM) Card ("Rewards Card") credit card with a credit limit of $10,000.

19.     From in or around January 2021 through January 2022, Plaintiff received marketing offers from Citibank for opening a new checking account, which contained a promotional offer for a $1500 bonus after completion of certain activities. *See* Exhibit A.

20.     On or around January 15, 2022, Plaintiff applied for and was approved by Citibank for a CitiGold Checking Account ("Checking Account").

21.     On or around January 27, 2022, Plaintiff deposited the requisite funds to his new Checking Account with new-to-Citi funds for a $1500 bonus.

22.     By letter dated March 16, 2022, Citibank closed the Checking Account, without stating any reason whatsoever. *See* Exhibit B. The letter stated that the Checking Account would be closed effective April 15, 2022.

23.     On or around March 28, 2022, Plaintiff contacted Citibank by means of telephone. A Citibank representative assured him that the $1500 bonus would be made available to him despite the account closure since he had completed all the requisite activities and that the account was being involuntarily closed per Citibank's decision.

24.     On or around April 8, 2022, Plaintiff contacted Citibank once again to make sure that he would be receiving the $1500 bonus; however, a representative notified him that because the account was closing on April 15, 2022, there was nowhere to deposit the $1500 bonus that Plaintiff had earned. Citibank refused to send the $1500 bonus to Plaintiff by any other means. As a result, Plaintiff never received the $1500 bonus.

25.     By letter dated April 17, 2022, Citibank closed the Rewards Card. *See* Exhibit B. The letter mentioned that Plaintiff could contact Citibank if he wanted the specific reasons for closing the credit card.

26.     On April 22, 2022, Plaintiff faxed a letter to Citibank and requested the specific reasons for closing the credit card.

27.     By letter dated May 2, 2022, Citibank sent Plaintiff the specific reason: "As a result of a previous review of your Citi banking account, it was determined that your Citi banking relationship would be terminated." *See* Exhibit B.

**II.     Dow Jones' Products and Services**

28.     Dow Jones & Company, Inc.'s ("Dow Jones") Risk Management & Compliance ("RMC") and Factiva products generate consumer reports on millions of consumers globally. They do so primarily by conducting "Adverse Media Screening," which is a process of assembling negative news from a wide variety of sources to create profiles on individuals. These

profiles are then made accessible to a large number of financial institutions, including Citibank, specifically for evaluating the risk-relationship of their customers.

29.     The financial institutions - including Citibank - that purchase these services by Dow Jones never reveal to their customers that a consumer report was evaluated. If the consumer report reveals a certain level of risk to the financial institution, then it would either deny the financial product or service or terminate a pre-existing relationship. The customer is never made aware of the source or existence of the consumer report that was used.

30.     The content of these consumer reports contains adverse information, such as civil suits, civil judgments, records of arrest, *inter alia*, without any time limitation. Although all this violates the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq., Plaintiff does not bring any claim against Citibank under the FCRA. Rather, the conduct that Citibank engages in is unfair under the ICFA because it violates these public policies, among other reasons.

31.     Moreover, Dow Jones does not recognize itself as a consumer reporting agency and thus does not disclose consumers its file on them.

32.     Dow Jones owns a wide variety of products and services. On its consumer-media end is its flagship publication, *The Wall Street Journal*. On its enterprise-media end, and most relevant to this suit, lies its "Professional Information" products.

33.     Dow Jones segment's Professional Information products, which target enterprise customers, combine news and information with technology and tools that inform decisions and aid awareness, research and understanding. These products consist of its Knowledge & Insight, Dow Jones Risk & Compliance and Dow Jones Newswires products. Specific products include the following:

a. *Knowledge & Insight*. Dow Jones Knowledge & Insight products consist primarily of Factiva, a leading provider of global business content, built on an archive of important original and licensed publishing sources. Factiva offers content from approximately 33,000 global news and information sources from over 200 countries and territories and in 28 languages. This combination of business news and information, plus sophisticated tools, helps professionals find, monitor, interpret and share essential information. As of June 30, 2021, there were nearly one million activated Factiva users, including both institutional and individual accounts.

b. *Dow Jones Risk & Compliance*. Dow Jones Risk & Compliance products provide data solutions for customers focused on anti-bribery and corruption, anti-money laundering, counter terrorism financing, monitoring embargo and sanction lists and other compliance requirements. Dow Jones's solutions allow customers to filter their business transactions and third parties against its data to identify regulatory, corporate and reputational risk, and request follow-up reports to conduct further due diligence. Products include online risk data and negative news searching tools such as RiskCenter Financial Crime Search and RiskCenter Financial Crime Screening and Monitoring for bulk screening. Dow Jones also provides an online solution for supplier risk assessment, RiskCenter Third Party, which provides customers with automated risk and compliance checks via questionnaires and embedded scoring. Feed services include PEPs (politically exposed persons), Sanctions, Adverse Media and other Specialist Lists. In

addition, Dow Jones produces customized Due Diligence Reports to assist its customers with regulatory compliance.

34.     **Intelligence Identifiers**. Factiva allows its users to "[t]rack competitors and targets with a comprehensive database of millions of public and private company profiles, plus financials and top executives."[1] It generates "expansive profiles" on "40M+ executives"[2] across the globe.

35.     **RiskCenter Third Party**. This tool allows its users to "screen third parties against [Dow Jones's] proprietary risk database."[3] "Results from risk database screenings are automatically embedded into the risk assessment algorithm to triage third parties into high, medium or low risk based on a comprehensive risk assessment calculation."[4]

    a.   Enhanced Due Diligence Reports. Dow Jones's website states: "For cases that warrant additional investigative research, order enhanced due diligence reports via a secure, interactive portal within RiskCenter. Enhanced due diligence reports from Dow Jones provide in-depth investigative research to identify anti-bribery and corruption and reputational risk posed by your third parties. Research is conducted in more than 60 languages by researchers with localized specialist knowledge, enabling them to deftly navigate lesser-known public records, international media, local third-party databases and web sources."[5] "Standard reports include... Government and political affiliations, as well as national and

---

[1] *See* https://www.dowjones.com/professional/factiva/.
[2] *See* https://www.dowjones.com/professional/intelligent-identifiers/.
[3] *See* https://www.dowjones.com/professional/risk/riskcenter-third-party/.
[4] *Id.*
[5] *Id.*

local litigation records (civil, criminal bankruptcy, judgment/liens),"[6] among

others.

b. <u>Risk Search</u>. Users can search through Dow Jones's pre-identified lists of global

sanctions on people and companies, politically exposed person and their relatives

and close associates, beneficial ownership data from Dun & Bradstreet ("D&B")

including the degree of separation of owners of various entities, global law

enforcement lists, Interpol Red Notices List, and "[s]pecial interest persons

including those who have been involved in a legal process related to key criminal

categories."[7]

36. **Due Diligence Research and Reports.** Dow Jones's key area of coverage

provides:

a. <u>Source of wealth</u>. "Detailed account of the subject's source of wealth, including

employment income, property and high-value assets, share ownership and income

from business transactions, loans and inheritances. We also highlight relevant

issues of concern, such as political or government connections, corruption, money

laundering, tax evasion, terrorism financing, fraud and other serious financial

crimes."[8]

b. <u>Adverse media and significant litigation</u>. "We go beyond media reporting to

include reviews of documents from local and national court records, as well as

local regulatory databases, for evidence of regulatory breaches, disciplinary

actions and litigation that may represent particular risks."[9]

---

[6] *Id.*
[7] *Id.*
[8] *See* https://www.dowjones.com/professional/risk/dow-jones-due-diligence/.
[9] *Id.*

    c.   <u>Beneficial ownership</u>. "Investigations of complex or opaque ownership structures to assess ultimate control. We draw on publicly available formal records— including those in certain jurisdictions requiring manual retrieval."[10]

    d.   <u>Types of Reports</u>. Dow Jones provides different types of reports, including "Reputation and role in public life—reviews of adverse media to protect against reputational risk," "Adverse media, including noteworthy allegations and evidence of involvement in/association with corrupt business practices or other regulatory risks," and "Litigation, criminal, bankruptcy and judgment searches."[11]

37.    **Adverse Media Screening**. "Adverse media screening involves the interrogation of third-party data sources for negative news associated with an individual or company."[12]  The tool is "[a] searchable database of adverse media profiles."[13]

38.    Dow Jones advocates for financial institutions to create "Special Interest Person" profiles using its due diligence tools.[14]

39.    Dow Jones's Q&A section recommends that allegations of criminality should be taken into consideration regardless of a formal conviction.[15]

40.    Dow Jones is a "consumer reporting agency" as defined by the FCRA because it accepts "monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and…

---

[10] *Id.*

[11] *Id.*

[12] *See* https://www.dowjones.com/professional/risk/adverse-media-screening/.

[13] *Id.*

[14] *See* https://www.dowjones.com/professional/risk/glossary/financial-crime/special-interest-person/.

[15] *See* https://visit.dowjones.com/risk/content/financial-crime-adverse-media-questions/#lp-pom-block-311.

uses… means or facility[ies] of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

41.    The data that Dow Jones compiles and distributes and/or sells to third parties constitutes a "consumer report" as defined by the FCRA because it contains "written, oral, or other communication[s] of… information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title." 15 U.S.C. § 1681a(d).

42.    Dow Jones compiles, creates and distributes information to its users about individual consumers including adverse news, global sanctions lists, civil judgments, bankruptcy records, records of arrest, records of conviction, criminal judgments, civil liens, business ownership interests, source of wealth, employment income, share ownership, property valuation, close associates, loans, inheritances, political connections, disciplinary actions, beneficial ownership interests, and litigation history, to name a few.

43.    Dow Jones disseminates information to financial institutions – including Citibank - such as consumers' name, job title, job location, phone number, fax number, biography, education history, names of colleagues, among other.

44.    Despite Dow Jones's clearly defined status as a "consumer reporting agency" and its intent to disseminate "consumer reports," it requires its users to agree to the following in its End User Agreement: "Customer acknowledges that Dow Jones is not a 'consumer reporting

agency' and that the Dow Jones Data does not constitute a 'consumer report' or 'investigative consumer report' as such terms are defined in the Fair Credit Reporting Act, 15 U.S.C. §1681, et seq. (FCRA), or any applicable state or national fair credit reporting laws. Accordingly, Customer represents and warrants that it will not use the Dow Jones Data for any permissible purpose under FCRA or applicable state or national fair credit reporting laws." *See* Exhibit C. However, Dow Jones has intentionally marketed its services to financial institutions specifically for establishing consumers' eligibility for the enumerated factors in 15 U.S.C. § 1681a(d)(1).

45.     Section 1681c(a) of the FCRA prohibits consumer reporting agencies from making any consumer report containing certain items of information:

  a.  Civil suits, civil judgments, and records of arrest that, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is longer; and

  b.  Any other adverse item of information, other than records of convictions of crimes, which antedates the report by more than seven years.

46.     Dow Jones made a consumer report of Plaintiff which contained an arrest record from August 10, 2012 – a time period in excess of seven years from the date of the report.

47.     Adverse media reporting, negative publicity, bad news, filing of a criminal complaint, information and indictment against Plaintiff, and other such adverse items of information that were older than seven years from the date of the consumer report, are all prohibited by 15 U.S.C. § 1681c(a).

48.     Dow Jones routinely collects information of civil suits, civil judgments, records of arrest, and other adverse information (other than records of convictions) spanning decades and disseminates such consumer reports to its users on a regular basis.

49.     Citibank is a paid subscriber to the full panoply of RMC products offered by Dow Jones, including, but not limited to, its RiskCenter, Sanctions Compliance, Due Diligence Research and Reports, and Adverse Media Screening. It routinely utilizes the RMC products to onboard each of its customer and to continually monitor each customer throughout the period of their active relationship.

50.     The adverse action taken by Citibank was in fact, made solely based on the adverse items of information contained in the consumer reports provided by Dow Jones.

### III.     Citibank's Policies Prevent People with Felony Records from Obtaining Essential Banking Services

51.     Citibank practices and has policies of denying and terminating any and all banking relations with any person who it finds out has a felony.

52.     The harm inflicted by felony records policies like Citibank's is significant, not only in terms of the sheer number of people affected, but also in terms of the consequences, for the wellbeing of our communities.

53.     When banks categorically discriminate felons, they are left with no more choices but to revert back to criminal activity. Companies such as Citibank never give felons a second chance. Thus, society ends up paying the price of Citibank's conduct.

54.     Banking services are essential and are a particularly crucial need for individuals reentering their communities immediately after time in prison.

55.     Research shows that success in opening a bank account and securing credit are critically important to allowing reentrants to gain employment, government benefits, and other community ties. Successful reintegration is not just a concern for those who return from prison: it

is also a matter of public safety and economic necessity.[16] Reducing recidivism is critical for community safety; providing effective rehabilitation and skill development for those incarcerated and formerly incarcerated is critical to strengthening households and the economy. Other research has shown reentrants who do not have access to essential banking services are more likely to recidivate than those who are able to.[17] Recidivism additionally impacts the whole surrounding community.

56.     Automatic felony bans directly prevent reentrants from obtaining such essential banking services, whether immediately after release from prison or decades later, without giving any consideration to the particular circumstances of a person trying to cash a check or secure credit to start a legitimate business. Banks such as Citibank that make it extremely difficult on reentrants to live a law-abiding life, unwittingly push them in the direction of recidivism. This complete disregard for individual circumstances cannot be justified under the law. Moreover, it needlessly injures formerly incarcerated individuals, their communities, and organizations that are committed to preserving access to essential necessities of life.

57.     Citibank's policies are overbroad and cannot be justified. Protecting the bank's reputation, safety or property is not a valid reason for an automatic ban, as most applicants with felony convictions do not pose a more significant risk to creditors than applicants without felony convictions. The protection of the reputation of the bank cannot be used to justify a policy that categorically banks all people with felonies or other types of criminal history without any attempt to distinguish between past criminal conduct that presents a risk to Citibank's assets or reputation and past criminal conduct that does not.

---

[16] https://www.ncjrs.gov/pdffiles1/nij/grants/230420.pdf
[17] https://www.dobs.pa.gov/For%20Media/Pages/Successful-Reentry.aspx

58.     Any legitimate concerns, including protecting safety or property, can be satisfied by a readily available and fairer policy: giving individualized consideration to each applicant's circumstances and credit history.

59.     In April 2016, the United States Department of Housing and Urban Development ("HUD") released "Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions" ("HUD Guidance").[18] That guidance notes that 100 million adults, nearly one-third of the U.S. population, have a criminal record of some kind. *Id.* at 1.

60.     Nationally, more than 625,000 inmates are released from confinement each year,[19] and they become targets of automatic felon bans at precisely the time then they need bank account and credit to reintegrate into society.[20]

61.     The sheer number of people released from prison every year has skyrocketed as the incarcerated population in the United States has grown from 300,000 in 1980 to more than 2.3 million today. Most are imprisoned for non-violent offences. Approximately 10 million misdemeanor cases are filed each year.[21] Approximately 19 million people across the country have at least one felony conviction.[22] At the same time that the sheer number of people with criminal convictions has dramatically increased, it has become much easier and more creditors to identify and ban people with criminal records because of the digitization of records and the concomitant growth of private companies that provide inexpensive background checks.

---

[18] https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF
[19] E. Ann Carson and Elizabeth Anderson, U.S. Dept. of Justice, Prisoners in 2016, BJS Bulletin, 10 (Aug. 2018), https://www.bjs.gov/content/pub/pdf/p16.pdf
[20] https://csgjusticecenter.org/wp-content/uploads/2020/02/12.15.17_Making-Peoples-Transition-from-Prison-and-Jail-to-the-Community-Safe-and-Successful.pdf
[21] Alexandra Natapoff, Misdemeanors, 85 S. CAL. L. REV. 1313, 1314-1315 (2012).
[22] Pew Research Center, https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/01/02/felony-conviction-rates-have-risen-sharply-but-unevenly

#### IV.     Citibank's Broad Policies and Practices Cannot be Justified as Necessary for Protecting Safety, Assets, or Reputation

62.     Extensive research establishes that protecting safety, assets or reputation does not justify a blanket felony records policy. The research shows that additional factors, such as the amount of time since the last offense, the person's age, and the type of conviction, must be considered to assess whether a past criminal conviction suggests a risk of future criminal conduct.

63.     It was in fact on that basis and the recommendation of the U.S. Probation Office, as determined by its categorization of very low risk, that this Court terminated Plaintiff's 3-year term of Supervised Release on the 1-year anniversary date from the commencement of supervision – a rare occurrence in criminal cases.

64.     The amount of time since the last offense is a critical factor in making this assessment. Studies show that in seven years or even less, the risk of future arrest for somebody with a past conviction becomes no greater than the risk for somebody without a past conviction.[23]

65.     Studies show that a person's age and the frequency of past criminal activity are also key factors in determining whether the individual poses any risk to safety, assets, or reputation. People with a criminal record who are older, and those with fewer criminal offenses, are much less likely to engage in future criminal conduct or to pose a threat to the community.

66.     Accordingly, safety, assets, and reputation do not provide a substantial and legitimate rationale for a broad blanket ban on eligibility like Citibank's policies and practices.

---

[23] Megan C. Kurlychek et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?*, 5 Criminology and Pub. Pol'y 483 (2006). See also Alfred Blumstein and Kiminori Nakamura, *Redemption in the Presence of Widespread Criminal Background Checks*, 47 Criminology 327 (2009).

**V.  Giving Individualized Consideration to Applicants' Circumstances Is a Readily Available and a Fairer Alternative That Would Satisfy Any Substantial and Legitimate Interest Behind Citibank's Policies and Practices**

67.     Giving individualized consideration to each applicant's circumstances is a fairer alternative to Citibank's policies and practices. This would address any substantial, legitimate, fair justification for the policies and practices.

68.     Specifically, to the extent safety, assets and reputational risks of Citibank are a valid justification, protection of those concerns can be accomplished through the use of individual assessments that consider the nature of an individual's conviction, the amount of time since the conviction or release, and evidence of rehabilitation, among other factors. An individualized assessment allows people with a criminal record, but who pose no realistic current or future threat to Citibank, to obtain baking services. This more tailored approach both protects safety, assets, and reputation *and* is fairer and exclusionary because it reduces the number of applicants who are categorically banned from obtaining financial services from Citibank.

69.     Citibank's overly broad policies and practices prevents any individualized consideration. But Citibank would not have to compromise any legitimate concerns that they may have to give individualized considerations to applicants' particular circumstances and allow those individuals whose relationship would not threaten safety, assets, or reputational interest of Citibank.

70.     Citibank's policies of automatically excluding people with felony convictions is not necessary to achieve a substantial and legitimate business interest.

**INJURY TO PLAINTIFF**

71.     As a result of Citibank's actions described above, Plaintiff has been directly and substantially injured. Plaintiff has been frustrated in his attempt to maintain a deposit account and obtain credit.

72.     Citibank bank is everywhere. It is one of the largest banks in the United States that covers every State in the nation. Many major companies such as American Airlines, Costco Exxon Mobil, Best Buy, Home Depot, etc. have their credit cards issued through Citibank. It has become an indispensable bank in most Americans' day-to-day lives.

73.     Transitioning to a different bank will lead Plaintiff to access to fewer fee-free ATMs, different service fees, interest rates, and other such distinctive effects.

74.     The termination of the Rewards Card led to a drop in Plaintiff's credit score. He now appears as a credit-seeker to subsequent creditors. The termination of the Rewards Card by Citibank led to a display of short payment history, higher credit card use due to the lowering of the total available credit, and a shorter credit age on his credit report. All factors in combination significantly alters his credit reports to the point that subsequent lenders will view him as a riskier applicant than he really is.

75.     Because Citibank's policies and practices have had and continue to have the effect of banning people with felony records from obtaining banking services, Citibank's conduct frustrates Plaintiff's livelihood and opportunity to obtain financial products free of arbitrary barriers.

76.     Plaintiff intends to open bank accounts, credit cards, seek loans, and invest his money in securities. He intends to live a law-abiding life; however, financial institutions like

Citibank make it extremely difficult for arrestees and former felons like him to obtain life's necessities, such as a bank account.

77.     As a direct and proximate result of Citibank' denial of the Rewards Card, Plaintiff lost a $10,000 line of credit. Moreover, the Rewards Card, just like the card's name, offered rewards points for each purchase that Plaintiff made, which were redeemable for things of monetary value such as cash, gift cards, travel, etc. – monetary rewards that Plaintiff has lost.

78.     As a direct and proximate result of Citibank' denial of the Rewards Card, Plaintiff lost an indeterminate line of credit, worth at least $1.

79.     But for the series of denials of the various banking services of Citibank, Plaintiff had to invest a substantial amount of time and money to relocate his assets.

80.     Citibank's acts and omissions have substantially impacted Plaintiff's livelihood. Plaintiff suffers from extreme anxiety, stress and is worried about his diminished finances. He suffers from a generalized fear that applying for a financial product would be futile and be met with embarrassment.

81.     Citibank's unlawful and unfair actions described herein have been intentional, willful, wanton, outrageous, fraudulent, grossly negligent, malicious, and have been, and are, implemented with callous and reckless disregard for rights protected under federal and state law.

## CAUSES OF ACTION

## COUNT I – Failure to Provide Principal and Specific Reasons in Violation of the ECOA, 15 U.S.C. § 1691(d)(2); 12 C.F.R. § 1002.9(b)(2)

82.     Plaintiff repeats and incorporates by reference all allegations set forth in the preceding paragraphs.

83.    ECOA and the regulations promulgated thereunder, require Citibank to provide Plaintiff 1) the "principal" reason for the adverse action, and 2) that they be the "specific reasons" for the adverse action.

84.    Citibank terminated Plaintiff's Rewards Card without a statement of reasons. The following reason is neither specific nor the principal reason under any circumstance: "As a result of a previous review of your Citi banking account, it was determined that your Citi banking relationship would be terminated."

85.    The termination of the Rewards Card constitutes an "adverse action" within meaning of 15 U.S.C. § 1691(d)(6). Citibank was a "creditor" within meaning of 15 U.S.C. § 1691a(e). Plaintiff was an "applicant" for each of the applications within meaning of 15 U.S.C. § 1691a(b).

86.    The Statement of Reasons for the adverse action on the Rewards Card failed to meet requirements under the ECOA. Citibank provided Plaintiff with a *sham* reason, which was neither the principal nor the specific reasons for the adverse actions. In fact, the principal and specific reason was that Plaintiff was a felon, which was based on the information it obtained from the consumer report provided by Dow Jones.

87.    By failing to provide applicants the valid reasons, they may never know what remedial actions to take.

88.    The ECOA adverse action notice requirement was enacted to "fulfill[] a broader need: rejected credit applicants will now be able to learn where and how their credit status is deficient and this information should have a pervasive and valuable educational benefit." S. REP. No. 94- 589, at 406, 408, 1976 WL 13838, at *4, *7 (Jan. 21, 1976). The notice requirement is intended to allow for the correction of errors "where the creditor may have acted on

misinformation or inadequate information." *Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 576 (6th Cir. 2016) (*quoting* S. Rep. No. 94-589, at 4 (1976)).

89. Citibank's acts and omissions constitute a violation of the ECOA and its implementing regulations under of 15 U.S.C. § 1691(d)(2).

90. Plaintiff seeks monetary damages, including compensatory and punitive, as well as declaratory and injunctive relief.

## COUNT II – Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2

91. Plaintiff repeats and incorporates by reference all allegations set forth in preceding paragraphs.

92. The Illinois Consumer Fraud Act and Deceptive Business Practices Act, 815 ILCS 505/2 prohibits any act or practice that is "unfair" in trade or commerce.

93. Plaintiff meets the ICFA definition of "consumer." See 810 ILCS 505/1.

94. While engaged in trade or commerce, Citibank has committed unfair acts and practices under the ICFA for several independent and cumulative reasons:

    a. The acts, policies and practices of denying financial products to felons, including Plaintiff, are inherently unfair, especially when done so without considering an individualized assessment of the prior criminal conduct.

    b. The termination of the Rewards Card and Checking Account, without providing any reason is unfair, arbitrary, and capricious.

    c. The acts and practices violate the Illinois Human Rights Act, 775 ILCS 5/1-102(A), which provides: "It is the public policy of this State [t]o secure for all individuals within Illinois… access to financial credit[.]"

    d.   Denying Plaintiff his $1500 bonus is unfair.

    e.   It failed to provide Plaintiff the specific and principal reasons as required by the ECOA and as claimed in Count One above. It knew that the reason was because of the information obtained from Factiva, RMC and other products by Dow Jones, and deliberately failed to mention it.

    f.   It used information from Dow Jones when it explicitly agreed that it would not do so in connection with a credit transaction with a consumer and other permissible purposes under the FCRA.

    g.   It grossly violated the standard of conduct contained in 15 U.S.C. § 1681m (Requirements on users of consumer reports) by:

        i.   Failing to provide Plaintiff and *all* of its other customers, the name, address, and telephone number of Dow Jones, a consumer reporting agency ("CRA"). § 1681m(a)(3)(A).

        ii.   Failing to provide Plaintiff a statement that Dow Jones did not make the decision to take the adverse action and is unable to provide Plaintiff the specific reasons why the adverse action was taken. § 1681m(a)(3)(B).

        iii.   Failing to provide Plaintiff a notice of his right to obtain a free copy of his consumer report from Dow Jones. § 1681m(a)(4)(A).

    h.   Failing to provide Plaintiff a notice of his right to dispute with Dow Jones the accuracy and completeness of the information in the consumer report furnished by Dow Jones. § 1681m(a)(4)(B).

     i.    Even if it could be said that Dow Jones is not a CRA, it nonetheless failed to disclose to Plaintiff the nature of the information it obtained from Dow Jones, which it used to deny the Rewards Card. § 1681m(b)(1); § 1681m(b)(2).

     j.    Failing to maintain reasonable procedures to assure compliance with the provisions of § 1681m(c).

95.    Citibank's conduct in relation to Plaintiff's account terminations was willful, malicious, unfair, and arbitrary.

96.    The above-described acts and practices offends public policy, are immoral, unethical, oppressive, and unscrupulous, and causes substantial injury to consumers.

97.    The conduct complained of here is so oppressive that Plaintiff is exhausted in finding a suitable financial institution that would allow him to open a credit card, brokerage account, and retirement account to secure his financial future.

98.    The injury is not outweighed by any countervailing benefits to consumers.

99.    The injury is not one that consumers could reasonably avoid, especially when financial institutions do not reveal the fact that Dow Jones's consumer reports were utilized in the determination of an application by a consumer.

100.    Plaintiff seeks monetary damages, including compensatory and punitive, as well as declaratory and injunctive relief.

## **DEMAND FOR JURY TRIAL**

101.    Under Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

## REQUESTED RELIEF

102.     Plaintiff respectfully asks that the Court grant him the following relief:

a.   Enter a declaratory judgment finding that the foregoing actions of Citibank violate
15 U.S.C. § 1691, 15 U.S.C. § 1681(m), and the Illinois Consumer Fraud and
Deceptive Business Practices Act.

b.   Enter a permanent injunction:

i.   Enjoining Citibank and its employees, agents, officers, and directors from
implementing and enforcing the unfair and unlawful conduct described
herein;

ii.   Directing Citibank and its employees, agents, officers, and directors to
revaluate Plaintiff's terminated accounts consistent with the Equal Credit
Opportunity and the Fair Credit Reporting Act.

iii.   Directing Citibank and its employees, agents, officers, and directors to
revise its policies and practices, to reduce the unfair effect it causes on
felons and to make them consistent with the Equal Credit Opportunity and
the Fair Credit Reporting Act; and

iv.   Directing Citibank and its employees, agents, officers, and directors to
take all affirmative steps necessary to remedy the effects of the unfair and
unlawful conduct described herein and to prevent additional instances of
such conduct or similar conduct from occurring in the future;

c.   Award compensatory damages to Plaintiff, in an amount to be determined by the
jury that would fully compensate Plaintiff for injuries caused by the conduct of
Citibank alleged herein;

d. Award punitive damages to Plaintiff, in an amount to be determined by the jury that would punish Citibank for its willful, wanton, outrageous, malicious, grossly negligent, fraudulent and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

e. Award Plaintiff his reasonable attorneys' fees and costs under 42 U.S.C. § 3613(c)(2);

f. Award prejudgment interest to Plaintiff; and

g. Order such other relief as this Court deems just and equitable.

Dated: May 9, 2022

Respectfully submitted,

/s/ Vivek Shah

Vivek Shah
236 Woburn Ln
Schaumburg, Il 60173

## **VERIFICATION OF COMPLAINT**

I, Vivek Shah, hereby declare under penalty of perjury that the foregoing facts contained in this Complaint are true and correct to the best of my knowledge.

Executed on May 9, 2022

/s/ Vivek Shah
VIVEK SHAH

# Exhibit A

**Welcome Checking Cash Bonus Offer**

[1] **TERMS AND CONDITIONS**

You can earn a $300, $700 or $1,500 "Bonus" by opening a new Checking Account, funding it with New-to-Citibank Funds within 20 days, and maintaining that balance for another 60 days.

**Eligible Customers:**

So long as you have not owned a Citi checking account in the last 180 days, are at least 18 years old, and furnish or have a valid Form W-9 or Form W-8BEN on file with Citibank and are not subject to backup withholding, you can participate in the Welcome Checking Cash Bonus Offer in select markets. Customers who open in a branch or use a residential address in NY, CT, NJ, DC, VA, MD, CA, NV or select markets in IL and FL when they apply for their Checking Account can qualify.

Certain "Checking Accounts" are eligible for the Welcome Checking Cash Bonus Offer. Your new Checking Account can be in either the Citigold® Account Package, Citi Priority Package, Citibank® Account Package, or Basic Banking Package (only Regular Checking available for Basic) from the time you open your account until you receive your Bonus.

- Checking Accounts that are living trust accounts and custodial accounts are eligible, but fiduciary, estate, business, retirement (IRAs, SEPs, CESAs, money purchase pension plans and profit-sharing plans), and other trust accounts will not qualify for this offer.

- International Personal Bank customers are not eligible for this offer.

**Required Activities:**

○ First, open a new Checking Account between January 5, 2022 and July 17, 2022 ("Offer Period").

○ Second, so long as July 17, 2022 has not passed, enroll in the Welcome Checking Cash Bonus Offer on the same day you open your new Checking Account pursuant to the instructions provided. You can enroll online by clicking "apply now" and following the instructions for online account opening or by contacting a Citibank representative by phone or in a branch and asking the representative to enroll you in the Welcome Checking Cash Bonus Offer. However, if you open your account on citi.com by any other means than those described, you will not be eligible to earn the Welcome Checking Cash Bonus Offer.

○ Third, on the 20th Day after you open your account, we will check your "On Deposit" balance in New-to-Citibank Funds which will determine the Maximum Bonus you can try to earn ("Balance"). Your Balance can be held in your Checking Account or between your Checking Account AND a new Citi Savings Account. As long as you maintain at least a $15,000 Balance every day for 60 calendar days starting on the 21st day after your 20th Day ("Maintenance Period") you will remain eligible for a Bonus, but **please understand if your Balance falls into a lower Balance Tier for even one day during the Maintenance Period, your Maximum Bonus will change (see Chart).**

- For example, if your Balance on the 20th Day is $200,000, the Maximum Bonus you could earn is $1,500. If your Balance is $150,000 on day 45, however, the Maximum Bonus you can earn changes to $700.

- "New-to-Citibank Funds" are 1) funds deposited from external accounts or payees other than Citibank, N.A. and 2) must be deposited using domestic ACH transfer, Direct Deposit, checks drawn on banks other than Citibank, N.A. or wire transfer. Cash deposits, Citi Global Transfers, international ACH transfers, international wire transfers, and person-to-person transfer services such as Apple Pay, PayPal®, Venmo, and Zelle®, do not qualify as New-to-Citibank Funds.

- You cannot use a Citi Accelerate Savings Account or an existing Citi Savings Account, but if you choose to open a new Citi Savings Account, in the same package as your Checking Account before your 20th Day, you can use that new "Savings Account" to maintain a portion of your Balance during the Maintenance Period.

- "20th Day" means the 20th calendar day after you open your Checking Account, but don't worry if your 20th Day falls on a weekend or U.S. Federal holiday. If that happens, we will count the next Business Day as your 20th Day instead. **If you open your**

new Checking Account over the phone (unless you use the DocuSign process), we will look at the 30th Calendar Day to determine your Maximum Bonus.

**Chart**

| "Balance Tiers" | "Maximum Bonus" |
|---|---|
| $15,000 - $49,999 | $300 |
| $50,000 - $199,999 | $700 |
| $200,000 and above | $1,500 |

- Fourth, to remain eligible, **your Checking Account must remain open and in good standing from the time it's opened until you receive your Bonus. Your Bonus will be paid to your Checking Account** within 90 days after you successfully complete all required activities. **Accounts that maintain a zero balance for 90 calendar days are subject to closure in Citibank's sole discretion and you will no longer be eligible for this offer.**

### Multiple Offers

The Welcome Checking Cash Bonus Offer is a checking offer. Checking Accounts may only be used to fulfill the Welcome Checking Cash Bonus Offer once per Offer Period. If you enroll in multiple checking account offers during an offer period and fulfill multiple checking account offers in the same month, you will be awarded the offer with the highest bonus value. If you enroll in multiple checking account offers during an offer period and fulfill multiple checking account offers across different months, you will be awarded the bonus of the first checking offer to qualify. Customers can only participate in each checking account offer once per offer period. If you enroll in multiple checking account or savings account offers during the Offer Period, the requirements of each offer must be met separately.

### Applicable Fees

For the Basic Banking Package, to waive the $12 monthly service fee, make one qualifying direct deposit per statement period and one qualifying bill payment per statement period, or maintain a $1,500 or more combined average monthly balance in eligible linked accounts. Fee also waived for first listed account owners 62 or older or for accounts opened after April 23, 2021 when one account owner is a minor. A monthly service fee of $25 and a $2.50 non-Citibank ATM fee apply to the checking account in the Citibank Account Package if a combined average monthly balance of $10,000 or more is not maintained. A monthly service fee of $30 applies to the Citi Priority Account Package if a combined average monthly balance of $50,000 or more is not maintained. There is no monthly service fee for a checking account in the Citigold Account Package. If you do not maintain a minimum combined average monthly balance of $200,000 in eligible linked deposit, retirement and investment accounts, your Citigold Account Package will be converted to the Citi Priority Account Package and your accounts will be subject to the terms and conditions then in effect for that package. Fees could reduce account earnings. For all account pricing details please visit citi.com/compareaccounts (https://www.citi.com/compareaccounts).

**Important Tax Information: The bonus will be reported to the IRS as interest to the first signer on the account, in the year received, as required by applicable law. Bonus payments received by U.S. persons will be reported on IRS Form 1099-INT for the year received. Bonus payments received by non-U.S. persons will be reported on IRS Form 1042-S for the year received. Customer is responsible for any applicable taxes and consulting a tax advisor. Citi is not a tax advisor. To be eligible for the Bonus, U.S. persons must furnish or have a valid IRS Form W-9 (Request for Taxpayer Identification Number and Certification) on file and foreign individuals must furnish or have a valid IRS Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Individuals)) on file. Accounts subject to backup withholding are ineligible.**

This offer may be withdrawn prior to enrollment. All accounts subject to applicable terms, fees, programs, products, and services which are subject to change. Accounts subject to approval. Participation and enrollment in a promotional offer does not guarantee eligibility or fulfillment of the promotional offer. Annual Percentage Yields (APYs) are variable and subject to change without notice after the account

Case: 1:22-cv-02437 Document #: 1 Filed: 05/09/22 Page 30 of 40 PageID #:30

is opened. Speak to a banker for more details. All accounts subject to the Client Manual Consumer Accounts and Marketplace Addendum.

APYs are variable and subject to change. APY ranges may be compressed during this Offer Period. Please visit https://online.citi.com/US/ag/current-interest-rates/checking-saving-accounts (https://online.citi.com/US/ag/current-interest-rates/checking-saving-accounts) or speak to a banker for current APYs.

Apple Pay is a registered trademark of Apple Inc. Zelle and the Zelle related marks are wholly owned by Early Warning Services, LLC and are used herein under license. PayPal.com and the PayPal logo are trademarks of PayPal Holdings, Inc., or its affiliates. PayPal terms and conditions apply. Certain other trademarks listed above are owned by third parties not affiliated with Citibank.

[2] Fees charged by other institutions for your transactions on non-Citibank ATMs are beyond Citibank's control and are in addition to the fees listed here.

[3] Requires a checking account in a Citigold or Citi Priority Account Package. Accounts are subject to approval.

[4] As a Citigold client and as a Citi Priority client, you can receive banking and lending services, including The Citigold Account Package and the Citi Priority Account Package, from Citibank, N.A. ("Citibank"), Member FDIC and Equal Housing Lender NMLS# 412915, along with financial planning and investment products as a client of Citi Personal Wealth Management, a business of Citigroup Inc. that offers investment guidance, products, and services through Citigroup Global Markets Inc. ("CGMI"), member SIPC (https://www.sipc.org). Citigroup Life Agency LLC ("CLA") offers insurance products. In California, CLA does business as Citigroup Life Insurance Agency, LLC (license number 0G56746). Wealth Relationship Managers are employees of Citibank and are employees and registered representatives of CGMI. Citibank, CGMI, and CLA are affiliated companies under the common control of Citigroup Inc.

[5] Citigold Concierge is the name of the service provided by Aspire Lifestyles for Citigold clients on behalf of Citigroup Inc. Citigroup Inc. and Aspire Lifestyles are not affiliated companies.

[6] Claim is based on locations in the United States where customers can make cash withdrawals with no surcharge (usage) fee by the ATM operator. Citibank customers can get cash, get information and make transfers between their eligible linked Citibank accounts with no surcharge fee when they use their Citibank® Banking Card at ATMs in the U.S. located at Citibank branches, ATMs at select retail store locations, and ATMs participating in the MoneyPass® Network. ATMs in retail stores and at other non-Citi locations are not owned or operated by Citibank and offer fewer functions. Use the Citi Worldwide ATM/Branch Locator on Citibank Online or the Citi Mobile® App to find the nearest ATMs and branches, including non-Citibank ATMs in the U.S. with surcharge-free access. MoneyPass is a registered trademark of Fiserv, Inc.

[7] Regular account charges apply. Citibank does not charge you a fee for using the Citi Mobile® App. You must have Internet access through your mobile device and charges from your wireless carrier may apply.

[8] This is a Citi sponsored program for eligible Citigold clients. TERMS & CONDITIONS AND FEES FOR ACCOUNTS, PRODUCTS, PROGRAMS AND SERVICES ARE SUBJECT TO CHANGE. The Citigold Subscription Rebate Program is available as a benefit of the Citigold relationship for Citibank customers who are account owners of a checking account and have received a direct invitation from Citibank to participate. The benefit to receive up to $200 in annual rebate(s) is limited to one customer per household. Trust, custodial, fiduciary, estate and business trust accounts are not eligible for this benefit. It may take up to 60 days for newly eligible customers to receive program invitation. Visit the Subscription Rebate Program Dashboard for more details and important information about this benefit. Rebates apply exclusively to memberships and subscriptions purchased online only.

©2022 Citigroup Inc. Citi, Citi and Arc Design and other marks used herein are service marks of Citigroup Inc. or its affiliates, used and registered throughout the world.

 

Exhibit B

CITIBANK CLIENT SERVICES
ATTN: C. G. S.
100 CITIBANK DRIVE
SAN ANTONIO TX 78245-9966

**IMPORTANT**
**Notice of Account**
**Closing**

Account Ending  1449

03/16/2022

R-122617220316

VIVEK  M SHAH
236 WOBURN LN
SCHAUMBURG          IL 60173

www.citibank.com

Dear  VIVEK  M SHAH,

**Why We're Writing to You**

We regret to inform you that following a recent review, Citibank, N.A. (Citibank) has chosen to close the account(s) referenced above. As stated in the terms and conditions of your Citibank Client Manual - Consumer Accounts or the CitiBusiness Client Manual, we reserve the right to close your account(s) at any time. Our decision was made following the results of a review of bank information and records. To help minimize impact to your banking, we ask that you please carefully read the information in this letter to identify any action you need to take.

**What You Need to Know**

**Your account will be closed effective  04/15/2022 and any Citibank ATM or debit cards for this account(s) will be canceled 5 days before.**

- Please stop issuing checks, scheduling payments or transfers, or conducting any ATM or debit card transactions. Any transactions that present to your account after it closes will not post and will be denied or returned. This includes checks, deposits, electronic credits or debits, transfers, bill payments, ATM withdrawal requests, and PIN or POS debit card transactions.
- Please cancel any direct deposits, automatic or recurring transactions, or any other type of electronic transactions you may have set up for this account(s).
- Please destroy and securely dispose of any account checkbooks.
- If you have funds in your account, we recommend that you withdraw or transfer these funds before your account closes. Please make sure that all outstanding transactions have posted to your account before you do this to prevent any returned items and applicable overdraft fees.

We will mail you a check for the remaining balance in your account after it closes. If you have an overdrawn balance, we will notify you in writing with instructions on how to make a deposit to cover the overdraft and to prevent being referred to collections.

**How to Contact Us**

If you have any questions or would like to speak with a representative, Customer Service can be contacted 24 hours a day, 7 days a week at:

| | |
|---|---|
| Citigold | 1-888-248-4465 |
| Citigold International Collect | 1-210-677-3789 |
| Text Telephone Service (TTY) | 1-800-788-6775 |

I473

R-122617220316
BSSU1007262.61528

Calls are randomly monitored and recorded to ensure quality service
Citibank Client Services provides customer account services for Citibank, N.A.

©2022 Citibank, N.A. Member FDIC. Citi, Citi and Arc Design and other marks used herein are service marks of Citigroup Inc. or its affiliates, used and registered throughout the world. All rights reserved.



April 17, 2022

Cards Services Support Unit
P.O. Box 6722
Sioux Falls, SD 57117-6722

Return Service Requested


## ⓘ UPDATE

00000005 1      69001660 DTF 00000005        01005294
|||ₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗₗ|||         UPGR

VIVEK M SHAH
236 WOBURN LN                                              VIVEK M SHAH
SCHAUMBURG IL 60173                          Citi® Rewards+ ending in 8051

# ❗We closed your account

Hi VIVEK M SHAH. Your account listed above closed as of Apr 17, 2022. You can no longer make transactions on this account and any associated cards should be destroyed immediately.

If your account has an outstanding balance, you're still responsible for payment and will continue to receive monthly billing statements until the balance is paid in full. Since your account is closed you'll lose any rewards your account may be enrolled in, such as points or cashback - please see your rewards terms & conditions for details.

If you'd like to know the specific reasons your account was closed, you can write to us at the following address by Jun 16, 2022:

Cards Services Support Unit
PO Box 6722
Sioux Falls, SD 57117-6722

You can also fax your request to 1-844-360-9716. We'll provide the requested information in writing within 30 days of your written request - please note that no information will be disclosed over the phone.

If you have any other questions, call us at 1-855-688-0555 (TTY: 1-800-201-7165 for hearing and speech impaired services only), Monday - Friday, 8:00 am - 10:00 pm, ET; Saturday & Sunday, 9:00 am - 5:30 pm, ET.





KYCCLOSE.A20220417P0000173.408.N.N

Cards Services Support Unit
PO Box 6722
Sioux Falls, SD 57117-6722

May 2, 2022

VIVEK M SHAH                                                          Account Number: 8051
236 WOBURN LN
SCHAUMBURG, IL 60173-2136

Dear VIVEK M SHAH:

We are writing to you in response to your request for a statement of specific reasons for the action taken to close your Citi Rewards+ account.

As a result of a previous review of your Citi banking account, it was determined that your Citi banking relationship would be terminated. In accordance with the decision to no longer do business with you, the above-referenced account were closed as of April 17, 2022.

We appreciate the opportunity to respond to your inquiry.

Sincerely,

Cards Services Support Unit
1-855-688-0555

For TTY: Use 711 or other Relay Services

FEDERAL REGULATIONS REQUIRE THE STATEMENT PRINTED BELOW

NOTICE: The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is the Bureau of Consumer Financial Protection, 1700 G Street, N.W., Washington, DC 20006.

The creditor is Citibank, N.A., 5800 South Corporate Place, Sioux Falls, SD 57108. Please direct any questions to the return address on this letter.

Exhibit C

**Dow Jones End User Agreement**

The terms set out in this End User Agreement ("**EUA**") apply to the Dow Jones Data, as defined below, which may be included from time to time in the services delivered to the client, customer, or subscriber identified in the order form ("**Customer**") under the agreement concluded with the provider, licensor, or granting party identified in the order form ("**Distributor**") for the provision of the subscription screening services (the "**Services**"), hereinafter referred to as the "**Agreement**"). Unless otherwise defined in EUA, any defined terms shall have the meanings given in the Agreement.

In this EUA, the following terms shall have the following meanings:

"**Applicable Data Protection Law**" means, in so far as applicable to the supply of the Dow Jones Data as part of the Services under the Agreement, all laws and regulations governing the protection of individuals with regard to the processing of Personal Data (including without limitation, security requirements for and the free movement of such Personal Data), including, but not limited to, as applicable: (a) the General Data Protection Regulation (EU) No. 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data ("GDPR") and any national law implementing or supplementing the GDPR; and (b) in the event that the UK withdraws from the European Union, any UK laws or regulations replacing, succeeding or re-enacting the GDPR;

"**Criminal Data**" means Personal Data relating to criminal convictions and offences or related security measures, including relating to the alleged commission of offences by a Data Subject or proceedings for an offence committed or alleged to have been committed by the Data Subject or the disposal of such proceedings, including sentencing;

"**Customer Query**" means any screening transaction request made by Customer within the Services for the delivery of Dow Jones Data;

"**Customer Query Report**" means any screening transaction result displayed within the Services in response to a Customer Query.

"**Data Controller**" means in relation to Personal Data any person who determines the purposes for which any Personal Data is, or is to be Processed;

"**Data Processor**" in relation to Personal Data, means any person (other than an employee of the data controller) who Processes the Personal Data on behalf of the Data Controller;

"**Data Security Breach**" means the unauthorized acquisition, access, use or disclosure of Dow Jones Data that compromises the security or privacy of such data to the extent the compromise poses a significant risk of financial, reputational, or other harm to the individual, consistent with Applicable Data Protection Law;

"**Data Subject**" means an individual who is the subject of Dow Jones Data;

"**Dow Jones**" means Factiva Limited, a company incorporated in England and Wales under number 3773253 and with registered address at The News Building, 7th Floor, 1 London Bridge Street, SE1 9GF London, England, acting on behalf of Dow Jones & Company, Inc. and any of its affiliated companies;

"**Dow Jones Data**" means any and all Personal Data, including Special Categories of Data and Criminal Data, Processed or transferred to Distributor by Dow Jones in connection with the supply of the Services;

"**EEA**" means the European Economic Area, consisting of all Member States of the European Union, plus Norway, Iceland and Liechtenstein, and for purposes of this EUA and the Agreement shall also include Switzerland and the UK after its withdrawal from the European Union;

"**Personal Data**" means any information relating to an identified or identifiable individual;

"**Permitted User**" *means* an individual authorised to access and use the Dow Jones Data and who is either: (a) an individual employee of the Customer; (b) an individual performing the functions of an employee on a temporary basis, independent contractor or consultant, in each case who is performing work for the Customer;

"**Process," "Processing," or "Processed**" means any operation or set of operations that is or may be performed upon Personal Data in relation to or as a result of this EUA and the Agreement, whether or not by automatic means, including, but not limited to, collection, recording, organization, storage, access, transmission, adaptation, alteration, retrieval, consultation, use, disclosure, dissemination or otherwise making available, alignment, combination, blocking, disposal, deleting, erasure, or destruction;

"**Special Categories of Data**" means Personal Data revealing racial or ethnic origin, political opinions, religious or philosophical beliefs, trade-union membership, genetic data, biometric data for the purpose of uniquely identifying a natural person, and data concerning health, a natural person's sex life or sexual orientation; and

"**UK**" means England, Wales, Scotland and Northern Ireland.

1. **Licence**

1.1 Distributor will supply the Dow Jones Data to the Customer during the term set forth in the order form and grants to the Customer a non-exclusive, non-transferable, non-sub licensable, non-assignable licence to use the Dow Jones Data, subject to the terms and conditions of the Agreement and this EUA.

1.2 The Dow Jones Data contains information derived from publicly available sources, and will be regularly up-dated by Distributor as updates are received from Dow Jones. Dow Jones retains control and ownership of the form and content of the Dow Jones Data, and although Dow Jones may alter the Dow Jones Data from time to time (and Distributor may alter the format of

the data), its fundamental nature will not be changed. The Customer and Permitted Users will not, under the Agreement or this EUA, acquire any ownership rights in the Dow Jones Data.

**2. Terms of use**

2.1 The Customer and Permitted Users shall use the Dow Jones Data in strict compliance with this EUA.

2.2 Except to the extent permitted or required for the Customer's permitted use under Section 2.1, the Customer and/or Permitted Users shall not: (a) reproduce, distribute, display, sell, publish, broadcast or circulate the Dow Jones Data to any third party, nor make the Dow Jones Data available for any such use; or (b) create or store in electronic form any library or archive of the Dow Jones Data save that, and notwithstanding anything to the contrary, the Customer shall be entitled to retain copies of the Dow Jones Data necessary for archival, regulatory and/or compliance purposes. The Customer's right to retain such copies as set forth above shall survive termination/expiration of this EUA provided that it no longer actively uses the Dow Jones Data within the Services.

**3. Warranties**

3.1 Distributor cannot warrant that the Dow Jones Data includes a complete or accurate archive of every public figure or their associates in each country. Except as specified in this EUA all express or implied representations, warranties, conditions and undertakings in relation to the provision of the Dow Jones Data are excluded.

3.2 Customer acknowledges that Dow Jones is not a "consumer reporting agency" and that the Dow Jones Data does not constitute a "consumer report" or "investigative consumer report" as such terms are defined in the Fair Credit Reporting Act, 15 U.S.C. §1681, et seq. (FCRA), or any applicable state or national fair credit reporting laws. Accordingly, Customer represents and warrants that it will not use the Dow Jones Data for any permissible purpose under FCRA or applicable state or national fair credit reporting laws.

**4. Customer Information**

Customer acknowledges and agrees that Distributor may report to Dow Jones information regarding Customer's subscription (including, but not limited to, Customer's name, date added as a Customer, and the number of Customer Queries). This information may be used by Dow Jones to verify the relevant usage of the Dow Jones Data and the payments due and payable by Distributor to Dow Jones in this respect. Customer hereby consents to the collection and processing of the Customer's name and its usage data for the purposes set out in this Section 4.

**5. Data Protection related obligations**

5.1 Customer agrees that:

5.1.1 Distributor and Dow Jones do not warrant that the Dow Jones Data includes a complete or accurate archive of every public figure or their associates, company, or news events in each country. Distributor does not imply any negative inferences about Data Subjects or entities referred to within the Dow Jones Data merely due to their inclusion within the Dow Jones Data.

5.1.2 As to the Processing of Dow Jones Data for the purpose of servicing Customer Queries, Customer is responsible for the material compliance with Applicable Data Protection Law of the Customer Queries and further Processing by Customer (including onward transfer, of the Dow Jones Data made available to Customer in the Customer Query Report) which includes responsibility for: (i) informing Data Subjects to whom the Customer Query or Customer Query Report relates, and obtaining their consent, if applicable; (ii) obtaining any required approvals from a regulatory or supervisory authority; (iii) establishing, and maintaining appropriate records of, the legal bases on which Dow Jones Data is Processed by Customer; (iv) determining the scope of the data included in the Customer Query Report; (v) ensuring data transfer mechanisms are in place where Dow Jones Data in the Customer Query Report are transferred outside of the EEA ; (vi) responding to any access and correction requests of Data Subjects in respect of the further Processing of Dow Jones Data made available to Customer in the Customer Query Report; and (vii) implementing appropriate technical, physical and organizational security measures, having regard to the state of the art and the costs of implementation, to protect Dow Jones Data against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access and against all other forms of unlawful Processing.

5.1.3 Customer shall implement and be responsible for appropriate technical, physical and organizational security measures, having regard to the state of the art and the costs of implementation, to protect Customer's equipment (including devices used by Permitted Users to access the Services) against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access and ensure secure access of Permitted Users to the Services.

5.1.4 The Services involve the Processing of Personal Data, which may include Special Categories of Data and Criminal Data. Customer acknowledges that under certain Applicable Data Protection Laws, and in particular those of the EEA, the Processing of Special Categories of Data and Criminal Data is strictly regulated and is only permitted on specific legal bases. The Dow Jones Data may be used by Customer only for the following purposes ("**Purposes**"), and Customer shall ensure that the Dow Jones Data is not used for any other purpose:

(a) performing customer or counterparty due diligence and other screening and risk management activities carried out to comply with legal or regulatory obligations to which Customer is subject, in particular "know your customer and counterparty" requirements under anti-money laundering, anti-bribery, corruption and economic sanctions regulation which apply to any member of the group of companies of the Customer;

(b) performing a statutory role as a Governmental organization;

(c) performing law enforcement duties;

(d)    any establishment, exercise or defense of legal claims relating to Sections 5.1.4 (a) to (c) above,

each to the extent permitted under, and subject always to, Applicable Data Protection Law.

Customer acknowledges that, depending on the country or countries in which Customer is established and is using the Service, the laws of such country or countries may apply. Customer further acknowledges that in some jurisdictions (in particular some EEA countries), the legal bases for Processing Special Categories of Data and Criminal Data may be limited to performing due diligence and other screening activities in order to comply with legal or regulatory obligations of Customer in the relevant country only. In those cases, Customer shall ensure that the Processing of the Dow Jones Data is limited to those purposes as authorized under relevant applicable law only (including Applicable Data Protection Law).

5.1.5 In addition to its obligations under this Section 5.1, Customer shall comply with its obligations under Applicable Data Protection Law.

5.2   **Cross-border transfers to a country outside the EEA.** In the event that the servicing of Customer Queries involves a cross-border transfer of Personal Data outside of the EEA, and if required by Applicable Data Protection Law, such transfer shall be subject to the standard contractual clauses available at http://eur-lex.europa.eu/legal-content/EN/TXT/?qid=1401799828216&uri=CELEX:32004D0915, which are incorporated herein.

5.3   **Inspection or audits by public authorities.** Customer shall submit its relevant Processing systems, facilities and supporting documentation to an inspection or audit relating to the Processing by a competent public authority if this is necessary to comply with a legal obligation. In the event of any inspection or audit, Customer shall provide all reasonable assistance to the Distributor in responding to that inspection or audit. If a competent public authority deems the Processing in relation to the Agreement unlawful, Customer shall take immediate action to ensure future compliance with Applicable Data Protection Law.

5.4   **Notification of non-compliance and right to suspend or terminate.** Each Party shall promptly notify the other Party: (a) if it cannot for any reason comply with its obligations under this EUA; or (b) becomes aware of any circumstance or change in Applicable Data Protection Law that is likely to have a substantial adverse effect on such Party's ability to meet its obligations under this EUA. Without prejudice to the termination provisions in the Agreement, each Party is entitled to temporarily suspend the Processing in whole or in part if such Party is unable to meet its obligations under this EUA, until such time that the non-compliance is remedied. To the extent such remedy is not available, such Party is entitled to terminate the relevant part of the Processing with immediate effect.

5.5   **Notice of disclosures.** Customer shall provide timely notice to Distributor if: (a) it receives an inquiry, a subpoena or a request for inspection or audit from a competent public authority relating to the Processing; or (b) it intends to disclose a Customer Query Report to any competent public authority, to the extent legally possible.

5.6   **Security Breach.** Customer shall provide timely notice to Distributor if it confirmed that a Data Security Breach has occurred in respect of a Customer Query or Customer Query Report and shall take adequate remedial measures as soon as possible as required by applicable law. Customer shall provide timely notice to Distributor if it detects or becomes aware that a Data Security Breach has occurred in respect of the Processing of Dow Jones Data and shall take adequate remedial measures as soon as possible.

5.7   **Data Deletion.** On termination or expiration of the Agreement, the Customer's rights to use the relevant Service shall cease and the Customer shall as soon as practicable purge all Dow Jones Data stored on any server within Customer's control, subject to any legal or regulatory requirements imposed on the Customer to retain copies of certain elements of the Dow Jones Data necessary, as determined by the Customer, for strictly limited archival, regulatory and/or compliance purposes (all on an otherwise passive, non-use basis).

**6.    Disclaimer, Limitation of Liability, Indemnity**

6.1    (a)    Customer agrees that Customer's use of the Dow Jones Data is on an "AS-IS" basis and Dow Jones and Distributor specifically disclaim any representations or warranties, express or implied, including without limitation, any representations or warranties of merchantability, non-infringement, or of fitness for a particular purpose. Dow Jones and Distributor make no representation, warranty, or guaranty as to the reliability, timeliness, quality, suitability, availability, accuracy or completeness of the Dow Jones Data. Customer acknowledges and agrees that errors or omissions contained in the Dow Jones Data shall not be made the basis for any claim, demand or cause of action against Dow Jones or Distributor.

(b)    NEITHER DOW JONES NOR DISTRIBUTOR SHALL BE LIABLE (JOINTLY OR SEVERALLY) TO CUSTOMER AS A RESULT OF CUSTOMER'S USE OF THE DOW JONES DATA FOR ANY OF THE FOLLOWING TYPES OF LOSS: (A) ANY SPECIAL, INDIRECT OR CONSEQUENTIAL LOSS; (B) ANY INCIDENTAL, PUNITIVE AND/OR EXEMPLARY DAMAGES; (C) LOSS OF PROFITS (WHETHER DIRECT OR INDIRECT); (D) LOSS OF BUSINESS (WHETHER DIRECT OR INDIRECT); (E) LOSS OF ANTICIPATED SAVINGS OR LOSS OF REVENUES (IN EITHER CASE, WHETHER DIRECT OR INDIRECT); (F) LOSS OF REPUTATION OR GOODWILL (IN EITHER CASE, WHETHER DIRECT OR INDIRECT); AND/OR (G) PENALTIES OR FINES (IN EITHER CASE, WHETHER DIRECT OR INDIRECT) (COLLECTIVELY THE "**EXCLUDED DAMAGES**") HOWSOEVER ARISING, WHETHER OR NOT CHARACTERISED IN NEGLIGENCE, TORT, BREACH OF STATUTORY DUTY, CONTRACT, OR OTHER BASIS OF LIABILITY, EVEN IF ANY OF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF OR COULD HAVE FORESEEN ANY OF THE EXCLUDED DAMAGES. CUSTOMER UNDERSTANDS AND AGREES THAT CUSTOMER'S USE OF THE DOW JONES DATA IS AT CUSTOMER'S SOLE RISK.

(c)    Notwithstanding anything to the contrary in the Agreement, Customer shall fully indemnify, defend and hold harmless Distributor and Dow Jones for any loss, claim, demand or damage (including reasonable attorneys' fees) suffered arising out of: (i) any breach by Customer of the representation and warranty given by Customer in Section 3.2 (*FCRA prohibition*); (ii) Customer's use of the Dow Jones Data or Customer's violation of this EUA or the Agreement; or (iii) Customer's breach of

Applicable Data Protection Law.

(d)     NOTWITHSTANDING ANYTHING HEREIN OR IN THE AGREEMENT OR A SUBSCRIPTION FORM TO THE CONTRARY, DISTRIBUTOR'S MAXIMUM AGGREGATE LIABILITY TO CUSTOMER RELATED TO OR IN CONNECTION WITH THE DOW JONES DATA SHALL BE LIMITED TO THE TOTAL AMOUNT PAID BY CUSTOMER OVER THE TWELVE (12) MONTH PERIOD PRIOR TO THE EVENT OF DEFAULT FOR THE PORTION OF THE SERVICES THAT MAKE UP CUSTOMER'S SUBSCRIPTION TO THE DOW JONES DATA. NOTWITHSTANDING ANYTHING HEREIN OR IN THE AGREEMENT OR A SUBSCRIPTION FORM TO THE CONTRARY, DOW JONES' MAXIMUM AGGREGATE LIABILITY TO CUSTOMER RELATED TO OR IN CONNECTION WITH THE DOW JONES DATA SHALL BE LIMITED TO TWO HUNDRED DOLLARS ($200).

The provisions of this Section 6 shall survive any expiration or termination of this EUA or the Agreement.

**7.     Third Party Rights**

7.1    A person who is not a party to this EUA or the Agreement shall not have any rights to enforce any term of the EUA or the Agreement, save that Dow Jones may enforce its rights against Customer under this EUA notwithstanding the fact that Dow Jones is not a party to this EUA.

**8.     Rights of Distributor**

8.1    If Distributor is unable to obtain the Dow Jones Data from Dow Jones despite Distributor's reasonable efforts and is unable to continue to provide Dow Jones Data to its customers, Distributor may terminate Customer's right to access and use, and receive corresponding Services with respect to the Dow Jones Data upon six (6) months' notice to Customer.

8.2    In the event of a breach, or reasonably anticipated breach, of this EUA, in addition to any other remedies available at law or in equity, Distributor shall have the right, in its sole discretion, to immediately suspend the Services.

**9.     Updates to EUA**

9.1    Distributor may update this EUA in its reasonable discretion from time to time.

*Last updated: March 20, 2019*